IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA

Alexandria Division

FITNESS GAMING CORPORATION,  )
                              )
              Plaintiff,      )
                              )
V.                            )        Civil Action No. 1:11CV200
                              )
ICON HEALTH & FITNESS, INC.,  )
                              )
              Defendant.      )
                              )

## MEMORANDUM OPINION

This case is before the Court on Defendant ICON Health & Fitness, Inc.'s ("ICON") Motion For Summary Judgment.  This is a patent infringement action brought by Plaintiff Fitness Gaming Corporation ("FGC") against Defendant.  It involves FGC's patent directed to the combination of (1) a piece of exercise equipment and (2) a gambling device, which device the patent refers to as an "electronic game of chance device." This motion for summary judgment of non-infringement turns on the interpretation of that term.

Pursuant to 35 U.S.C. § 271(a), "whoever without authority makes, uses, offers to sell, or sells any patented invention, within the United States or imports into the United States any patented invention during the term of the patent therefor, infringes the patent." The "patented invention" is defined by "one or more claims

particularly pointing out and distinctly claiming the subject matter which the applicant regards as his invention." 35 U.S.C. § 112. In general, a claim defines the subject matter that it covers by setting forth a list of requirements that must be met in order to qualify as "the patented invention." The more requirements, the narrower the scope of the claim. The requirements of a claim are generally referred to as "claim elements" or "claim limitations."

To determine whether a particular device or method is covered by a claim, a two-step analysis is performed. First, the patented invention, as set forth in the words of the patent claims, must be clearly understood. This is a question of claim construction, or claim interpretation, and it is determined by a court as a matter of law. Markman v. Westview Instruments, Inc., 517 U.S. 370 (1996). Under the second step of the analysis, the accused device or process is compared to the claims to determine whether there is infringement. Hormone Research Foundation v. Genentech, Inc., 904 F.2d 1558, 1562 (Fed. Cir. 1990).

Infringement can occur in two ways: there can either be literal infringement or infringement under the doctrine of equivalents. "Literal infringement exists if each of the limitations of the asserted claim(s) read on, that is, are found in, the accused device." Baxter Healthcare Corp. v. Spectramed, Inc., 49 F.3d 1575, 1583 (Fed.

Cir. 1995). "The absence of even a single limitation . . . precludes a finding of literal infringement." Kahn v. General Motors Corp., 135 F.3d 1472, 1477 (Fed. Cir. 1998). Even if there is no literal infringement, there still may be infringement under the doctrine of equivalents, but only if, for each limitation not present literally, the accused product nevertheless contains a permissible "equivalent." Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17 (1997). Each and every requirement of a claim must be met, either literally or by a permissible equivalent, in order to find infringement. Id. at 29.

The purpose of "claim interpretation" or "claim construction" is to make an objective assessment about what a person of ordinary skill in the art at the time the patent was filed would have understood to be the meaning employed by the patentee for the words in the claims. Phillips v. AWH Corp., 415 F.3d 1303, 1313, 1316-17, 1321-23 (Fed. Cir. 2005) (en banc). The focus is on "how the patentee used the claim term in the claims, specification, and prosecution history." Id. at 1321. "Ultimately, the interpretation to be given a term can only be determined and confirmed with a full understanding of what the inventors actually invented and intended to envelop with the claim. That construction that stays true to the claim language and most naturally aligns with the patent's description of the invention will

be, in the end, the correct construction." Renishaw PLC v. Marposs Societá per Azioni, 158 F.3d 1243, 1250 (Fed. Cir. 1998).

The prosecution history of the patent is also important evidence in determining the meaning of the claims. Phillips, 415 F.3d at 1317. The administrative procedure conducted in the PTO before the patent was granted is called "prosecution," and the written record of prosecution is called the "prosecution history" of the application. The prosecution history contains the complete record of all the proceedings before the PTO, including any representations made by the applicant regarding the scope of the claims.

The prosecution history limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance. Phillips, 415 F.3d at 1317; Vitronics, 90 F.3d at 1583. "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." Southwall Techs. Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995); see also Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1378 (Fed. Cir. 1998). Arguments made during the prosecution history may not only limit the interpretation of claim terms, but may also "estop an applicant from recapturing that surrendered matter under the doctrine of equivalents." Augustine Medical, Inc. v. Gaymar Indus.,

4

Inc., 181 F.3d 1291, 1299 (Fed. Cir. 1999) (internal quotation marks omitted). This is so, whether or not such assertions were truly required to secure allowance of the claim. Texas Instruments Inc. v. United States Int'l Trade Comm'n, 988 F.2d 1165, 1174-75 (Fed. Cir. 1993).

The specification and prosecution history are together referred to as the "intrinsic evidence." Vitronics, 90 F.3d at 1582. Evidence other than the specification and prosecution history ("extrinsic evidence"), such as dictionaries, can be used to help interpret claim terms, but cannot be used to contradict the intrinsic evidence. Id. at 1584. In the end, the proper interpretation is one that is "consistent with a patent's internal logic," "comports with the instrument as a whole," and "preserve[s] the patent's internal coherence." Markman, 517 U.S. at 389-90.

Summary judgment is appropriate where a party cannot "make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." Celotex Corp. v. Catrett, 477 U.S. 317, 322 (1986). Here, the burden of proving infringement is on the patent owner. Mannesmann Demag Corp. v. Engineered Metal Prods. Co., 793 F.2d 1279, 1282 (Fed. Cir. 1986). Thus, the burden of the moving party (here, ICON) may be discharged by simply pointing out "that there

is an absence of evidence to support the nonmoving party's case."
Id. at 325. Here, the specification and prosecution history make
clear what the claims require as a matter of law, and FGC has no
evidence that the accused devices have what the claims require.
Therefore, summary judgment of non-infringement should be granted.

On February 28, 2011, plaintiff Fitness Gaming Corporation
("FGC") filed the Complaint in this action against defendant ICON
Health & Fitness, Inc. ("ICON"), alleging infringement of U.S. Patent
No. 6,413,191 ("the '191 patent") and that ICON has infringed claims
1, 7, and 8 of the '191 patent.

On June 1, 2011, FGC served an expert report signed by R. Lee
Rawls asserting that ICON has infringed claims 1, 5, 7, 8, and 9 of
the '191 patent and providing interpretations of various terms in
those claims.

The '191 patent states that "[t]he present invention is directed
to the combination of an electronic game of chance device and a piece
of exercise equipment," and each of the claims asserted by FGC
requires an "electronic game of chance device" connected to a piece
of exercise equipment.

**Claim 1 of the '191 patent reads as follows:**

> A system comprising: 1)a piece of exercise
> equipment; 2) an electronic game of chance
> device connected to the piece of exercise

6

equipment;   3) means for initiating the system; and 4) means for operating the system when the electronic game of chance device and the piece of   exercise   equipment   are   being   used simultaneously.

**Claim 5 of the '191 patent reads as follows:**

A control circuit for detecting a simultaneous use of an exercise equipment connected to an electronic game of chance device, comprising: 1) an exercise equipment detecting circuit to detect whether the exercise equipment is being used; 2) an electronic game of chance detecting circuit to detect whether the electronic game of chance device is being played, the electronic game   of   chance   detecting   circuit   being electronically connected to the electronic game of chance detecting circuit; and 3) wherein, during a predetermined period of time, the exercise equipment and the electronic game of chance device operate when being simultaneously used.

7

**Claim 7 of the '191 patent reads as follows:**

A combination device, comprising:  1) a piece of exercise equipment; 2) an electronic game of chance device connected to the exercise equipment; 3) an initiation detecting circuit to initiate the combination device when an initiation signal is received; 4) an exercise equipment detecting circuit to detect when the exercise equipment is being used; and 5) an electronic game of chance detecting circuit to detect when the electronic game of chance is being played, the electronic game of chance detecting circuit being electronically connected to the exercise equipment detecting circuit; 6) wherein, during a predetermined period of time, the combination device operates when the exercise equipment is being used and, simultaneously, the electronic game of chance is being played.

**Claim 8 of the '191 patent reads as follows:**

A method for operating a combination machine including an exercise equipment connected to an

8

electronic game of chance device, comprising the steps of: 1) initiating the electronic game of chance device; 2) using the exercise equipment and playing the electronic game of chance device for a predetermined period of time; 3) wherein, at the end of the predetermined period of time, the combination machine shuts down when the exercise equipment and the electronic game of chance device are not being simultaneously used.

**Claim 9 of the '191 patent reads as follows:**

A method for making a combination machine including an exercise equipment and electronic game of chance device, comprising the steps of: 1) providing initiation means to initiate the combination machine; 2) connecting the exercise equipment to an exercise equipment detecting circuit, the detecting circuit outputting an exercise-on signal when the exercise equipment is being used; 3) connecting the electronic game of chance device to an electronic game of chance detecting circuit, the detecting circuit outputting a game-on signal when the electronic

game of chance device is being played; and
providing an exercise/game control circuit to
receive the exercise-on signal and the game-on
signal, the exercise game control circuit
allowing the combination machine to operate
when exercise-on signal and game-on signal are
simultaneously received during a predetermined
period of time.

The specification of the '191 patent expressly equates
"electronic game of chance" with "legalized gambling device."
Specifically, in one portion of its specification, the '191 patent
states the operator may then start playing the electronic game of
chance, i.e. a legalized gambling device.

In the "Background of the Invention" section, the '191 patent
states that legalized gambling establishments are becoming more and
more prominent worldwide and that electronic games of chance, such
as electronic slot machines, are one of the most widely used games
at these establishments. Thus, the Background of the Invention
section gives "electronic slot machines" as an example of "electronic
games of chance" and explains that "electronic games of chance" are
"one of the most widely used games" at "legalized gambling
establishments." The '191 patent also refers to an "electronic slot

10

machine" as an example of an "electronic game of chance" elsewhere.

The '191 patent further explains that a "game of chance" involves a "wager": "Each game of chance incorporates its own method of accepting a wager from the player," including "insertion of a coin or token, acceptance and verification of a piece of paper currency, or decoding and debiting a balance of a credit or debit card."

The '191 patent describes "the interaction between an operator and a combination of an exercise equipment and an electronic game of chance" as follows, also identifying the use of a "wager" in the interaction:

> "The combo machines starts when the operator makes a wager. An indicator, such as a 'Coin Accepted' light, illuminates. The operator then begins to use the exercise equipment, including programming the device to adjust speed and difficulty settings, etc. The operator then "plays" the electronic game of chance. Play and exercise will continue. If a predetermined delay expires without a new wager being made, the exercise equipment will shut down. Likewise, if the operator does not use the exercise equipment while playing the electronic game of chance, the combo machine will not allow the operator to play."

When claims 1, 7, and 8 of the '191 patent were first submitted to the Patent Office, the Examiner rejected them in an Office Action mailed October 4, 2000 as being unpatentable under 35 U.S.C. § 102 in light of U.S Patent No. 5,240,417 to Smithson et al. ("Smithson").

11

The Examiner asserted that all of the requirements of the claims were disclosed in Smithson.

Smithson discloses a simulated bicycle riding device, using a stationary bicycle in combination with a video display. The video display shows a computer-animated bicycle on a computer-animated racing track. The display reflects changes in the animated bicycle's speed and position as it is controlled by a user riding on and controlling the stationary bicycle.  A user can activate the simulator by depositing a token or coin in the device.

In response to the October 2000 Office Action, the Applicant filed a "Request for Reconsideration" dated February 5, 2001.  In the Request for Reconsideration, the Applicant first stated that the Applicant's invention involved the use of a "gambling device": "As the Examiner knows from a previous interview, the invention concerns the combination of a gambling device, such as a slot machine, with a piece of exercise equipment." The Applicant then explained that the term "electronic game of chance" was a term that the Applicant intended to define to refer to a gambling device: "An inventor is entitled to be her own lexicographer. In this case, applicant has chosen to claim the gambling device portion of the invention as 'an electronic game of chance,' which is consistent with preferable phraseology in the gaming and casino industry, as well as ordinary usage."

12

The Applicant then took issue with the Examiner's assertion that Smithson discloses "an electronic game of chance," with the following argument:

> "The Examiner asserts that Smithson et al. discloses each of the limitations of each of the claims. Smithson et al., however, discloses absolutely nothing about an electronic game of chance. Smithson et al. simply discloses a video display-based simulated bicycle ride. This is not a game of chance; it is a game of skill. By its claims, Applicant is not intending to cover such video-type arcade games which permit interaction by a skillful user. Such devices are not electronic games of chance; they do not accept wagers and do not permit payouts, as governed by the controlling gaming and casino regulatory bodies. Thus, Smithson et al. does not disclose the most fundamental limitation of each of Applicant's claims."

The Applicant then took issue with the Examiner's assertion that Smithson discloses a "wager," with the following argument:

> "[T]he deposit of money into a coin operated video arcade game such as Smithson et al. cannot be understood to be a wager as claimed. Not even the children that play these video arcade games consider the coins they deposit to be a wager. And, certainly the parents that supply these coins do not consider their children to be wagering or betting on these games. Parents do not send their children off to gamble on these games and have no expectation of getting their coins back even if their children succeed at the games."

In response, the Examiner rejected the claims once again based on Smithson.

The Applicant then filed another "Request for Reconsideration."

13

In this Request, the Applicant again distinguished the claimed invention based on the requirement for an "electronic game of chance," repeating the same argument the Applicant had made before: "As made clear in the Request for Reconsideration filed on February 5, 2001, applicant has distinguished her claims from video games of skill based on the specific recitation of part of the claimed combination to include an 'electronic game of chance.' Again, an electronic game of chance accepts a wager from a user and permits a payout based on random events as governed by the controlling game and casino regulatory bodies."

The Applicant also continued to take issue with the Examiner's assertion that Smithson discloses a "wager": "As to claim 2, please explain how the disclosure at Smithson et al. col. 30, lines 1-12, where money is added to the arcade game to play the video, can possibly be considered a wager, when Smithson et al. gives no teaching that the money can be won back."

When the Applicant received no response to the Request for Reconsideration from the Examiner, she filed an Appeal Brief appealing the Examiner's decision to the Board of Patent Appeals and Interferences. In the Appeal Brief, the Applicant again summarized the claimed invention as involving the use of a "gambling device": "The present invention offers a unique source of entertainment for individuals working out and, from the perspective of a casino owner,

offers a new locale for promoting legal gambling services. As shown for example in Fig. 2, the invention includes the unique combination of a piece of exercise equipment, such as a stationary bike 102, and an electronic game of chance (or gambling device), such as a slot machine."

In the Appeal Brief, the Applicant then repeated the explanation that the term "electronic game of chance" was a term that the Applicant intended to define to refer to a gambling device: "An inventor is entitled to be her own lexicographer. In this case, Applicants have chosen to claim the portion of their invention that people commonly think of as a gambling device as 'an electronic game of chance.' This phraseology was selected to avoid the use of the less formal, slang-like term 'gambling device' and to adopt the more formalized and descriptive term 'game of chance,' which is consistent with preferable phraseology in the gaming and casino industry."

The Appeal Brief then further defined the term "electronic game of chance" by repeating for yet a third time the arguments already made in the two previous Requests for Reconsideration: "An electronic game of chance accepts a wager from a user and permits a payout based on random events as governed by the controlling gaming and casino regulatory bodies."

The Appeal Brief then again took issue with the Examiner's conclusion that *Smithson* disclosed an "electronic game of chance,"

15

relying on the same argument yet again:

> "The Examiner asserts that Smithson discloses
> each of the limitations of each of the claims.
> Smithson et al., however, discloses absolutely
> nothing about 'an electronic game of chance.'
> Smithson simply discloses a video
> display-based, simulated bicycle ride—a
> preprogrammed arcade video. This is not a game
> of chance; it is preprogrammed by the
> manufacturer, and a game of skill to the user.
> Such devices are not electronic games of chance;
> they do not accept wagers and do not permit
> payouts, as governed by the controlling gaming
> and casino regulatory bodies."

The Applicant also used the Appeal Brief to continue to take

issue with the Examiner's assertion that Smithson discloses a

"wager":

> "The deposit of money into a coin operated video
> arcade game such as Smithson cannot be
> understood to be a wager as claimed. Not even
> the children that play these video arcade games
> consider the coins they deposit to be a wager.
> And, certainly the parents that supply these
> coins do not consider their children to be
> wagering or betting on these games. Parents do
> not send their children off to gamble on these
> games and have no expectation of getting their
> coins back even if their children succeed at the
> games. . . . As explained above, a wager is the
> bet for an electronic game of chance against
> which a payoff can be received. Smithson makes
> no reference to such a wager and provides no
> teaching that money can be won back using his
> video arcade game."

In response to the Appeal Brief, the Examiner withdrew his

rejection of the claims and the U.S. Patent and Trademark Office

issued the '191 patent with those claims on July 2, 2002.

In its Disclosure of Asserted Claims and Preliminary Infringement Contentions, Plaintiff FGC asserted that claims 1, 7, and 8 of the '191 patent are infringed by five of Defendant ICON's products: (1) the NordicTrack C4 si Bike, (2) the ProForm 450 UR Upright Bike, (3) the HealthRider Exerplay 300, (4) the HealthRider H45xr, and (5) the Reebok RB 310 Recumbent Exercise Bike ("the five Accused Devices" or "Accused Devices").

The expert report served by FGC asserts that claims 1, 5, 7, 8, and 9 of the '191 patent are infringed by a total of fourteen of Defendant ICON's products (also "Accused Devices"), including the five Accused Devices identified in FGC's Disclosure of Asserted Claims and Preliminary Infringement Contentions.

Each of the Accused Devices has a video console that allows a user to play games while exercising, including games called "Fat Blocker," "Calorie Destroyer," "Blackjack," and "Texas Hold 'Em."

Plaintiff FGC asserts that the requirement for an "electronic game of chance device" in claims 1, 5, 7, 8, and 9 is met in each of the Accused Devices by the video console that allows a user to play "Blackjack" and "Texas Hold 'Em."

The "Blackjack" game that can be played on the video console included with each of the Accused Devices ("the Accused Blackjack Game") is a video card game played with "credits," which have no value other than in the Accused Blackjack Game itself.

The Accused Blackjack Game does not accept coins or tokens, accept a piece of paper currency, accept a credit or debit card, or accept any other form of money.

The Accused Blackjack Game does not pay any money to the user.

There is nothing associated with the Accused Blackjack Game (and Plaintiff FGC has no evidence that there is anything associated with the Accused Blackjack Game) that is governed by a controlling gaming or casino regulatory body.

The Texas Hold 'Em Game that can be played on the video console included with each of the Accused Devices ("the Accused Texas Hold 'Em Game") is a video card game played with "credits," which have no value other than in the Accused Texas Hold 'Em Game itself.

The Accused Texas Hold 'Em Game does not accept coins or tokens, accept a piece of paper currency, accept a credit or debit card, or accept any other form of money.

The Accused Texas Hold 'Em Game does not pay any money to the user.

There is nothing associated with the Accused Texas Hold 'Em Game that is governed by a controlling gaming or casino regulatory body.

An analysis of infringement first assesses the meaning of the terms used in the claims and then compares the claims to the accused product. The absence of even one limitation in the accused product precludes infringement. Here, in order to show that there is

non-infringement, it is only necessary to address the meaning of the term "electronic game of chance device." All of the claims require an "electronic game of chance device," and the specification and the prosecution history make clear that the term does not cover the video consoles and games used in Accused Devices, as a matter of law.

The specification and prosecution history demonstrate that an "electronic game of chance" is a "legalized gambling device," and, as such, it must "accept a wager from a user and permit a payout based on random events as governed by the controlling gaming and casino regulatory bodies." The specification and prosecution history also make clear that a "wager" (and a "payout") involve money, not imaginary "credits" that only have value within a game itself.

The specification expressly states: "The operator may then start playing the electronic game of chance, i.e. a legalized gambling device." "[T]he specification's use of 'i.e.' signals an intent to define the word to which it refers…." Edwards Lifesciences LLC v. Cook, 582 F.3d 1322, 1334 (Fed. Cir. 2009); accord Abbott Labs. v. Novopharm Ltd., 323 F.3d 1324, 1327, 1330 (Fed. Cir. 2003). Thus, the specification expressly defines the term "electronic game of chance" as "a legalized gambling device." Consistent with this definition, the specification and prosecution repeatedly discuss the invention as an innovation in the field of "gambling."

19

The specification introduces the invention in the context of a discussion about "gambling establishments," and promotes the invention as providing a "new locale" for "casino owners" to promote their "gambling services." Moreover, the specification repeatedly refers to slot machines as an example of an "electronic game of chance" and repeatedly confirms that a "game of chance" involves a "wager". Indeed, the specification repeatedly uses the term "gambling device" interchangeably with the term "electronic game of chance."

The prosecution history provides even greater clarity. During the prosecution history, the Applicant twice explained that she intended to act as her own lexicographer and expressly stated that "electronic game of chance" was a term that she intended to use to refer to what "people commonly think of as a gambling device." The Applicant then set forth the requirements for such a device: it "accepts a wager from a user and permits a payout based on random events as governed by the controlling gaming and casino regulatory bodies." The Applicant adopted this definition no less than four times, twice to define the meaning of "electronic game of chance" and twice to distinguish the device in Smithson from an "electronic game of chance."

The specification and prosecution history make clear that an

"electronic game of chance device" is a "legalized gambling device"
and, as such, it "accepts a wager from a user and permits a payout
based on random events as governed by the controlling gaming and
casino regulatory bodies."

The specification and prosecution history also make clear that
the "wager" and the "payout" described in this definition involve
money, i.e., something that has value outside of the game itself.
The specification describes three types of methods of accepting a
"wager," including "insertion of a coin or token, acceptance and
verification of a piece of paper currency, or decoding and debiting
a balance of a credit or debit card." The slot machine used as an
example of an "electronic game of chance" in the patent accepts coins.
Obviously, all of these examples involve the use of money as a wager,
not imaginary "credits." This is consistent with the explanation
throughout the specification and prosecution history that an
"electronic game of chance" is a device for "gambling."

The prosecution history further confirms this. On at least two
occasions, the Applicant argued that a wager involves "money [that]
can be won back."  A device that did not accept money as a wager would
not be a device that  people commonly think of as a gambling device,
nor would it be a device that is governed by the controlling gaming
and casino regulatory bodies.

21

Having identified the meaning intended by the Applicant for the
term "electronic game of chance device," it is clear that the Accused
Devices do not literally infringe. This is for at least two reasons.
First, the Accused Devices do not "accept a wager from a user" or
"permit a payout" based on random events or otherwise, as the
Applicant's own prosecution history definition requires. The Accused
Devices do not accept money nor do they pay money; indeed, there is
no mechanism in the Accused Devices that would allow the Accused
Devices to do so. Neither in its "Disclosure of Asserted Claims and
Preliminary Infringement Contentions" nor in its expert's report
does FGC points to any evidence that the Accused Devises meet this
requirement.

Second, there is nothing associated with the Accused Devices
that is governed by the controlling gaming and casino regulatory
bodies. No gaming / casino regulatory body has asserted jurisdiction
over anything in the Accused Devices. Moreover, Plaintiff FGC has
no evidence that there is anything in the Accused Devices that is
governed by the controlling gaming and casino regulatory bodies. In
neither its "Disclosure of Asserted Claims and Preliminary
Infringement Contentions" nor its expert's report does FGC point to
any evidence that the Accused Devices meet this requirement. The
Accused Devices do not have an "electronic game of chance device"

as the Applicant defined that term for purposes of the '191 patent. Summary judgment of no literal infringement should be granted.

If there is no literal infringement, there still may be infringement under the doctrine of equivalents but only if, for each limitation not present literally, the accused product nevertheless contains a permissible "equivalent." Warner-Jenkinson Co. v. Hilton Davis Chemical Co., 520 U.S. 17 (1997). An alleged "equivalent" that was disavowed during the prosecution history is not a permissible "equivalent" because the prosecution history limits the interpretation of claims so as to exclude any interpretation that may have been disclaimed or disavowed during prosecution in order to obtain claim allowance. Phillips, 415 F.3d at 1317; Vitronics, 90 F.3d at 1583. "Claims may not be construed one way in order to obtain their allowance and in a different way against accused infringers." Southwall Techs. Inc. v. Cardinal IG Co., 54 F.3d 1570, 1576 (Fed. Cir. 1995); see also Spectrum Int'l, Inc. v. Sterilite Corp., 164 F.3d 1372, 1378 (Fed. Cir. 1998).

During the prosecution history, the Applicant clearly disavowed coverage of a device that was not a "gambling device," i.e., the Applicant disavowed coverage of a device that did not "accept a wager from a user and permit a payout based on random events as governed by the controlling gaming and casino regulatory bodies." Therefore,

FGC is precluded from asserting infringement under the doctrine of equivalents for a device that does not "accept a wager from a user," does not "permit a payout," and is not "governed by the controlling gaming and casino regulatory bodies." Thus, FGC is precluded from asserting that ICON's device infringes under the doctrine of equivalents.

For these reasons the Defendant's Motion for Summary Judgment should be granted.  An appropriate Order shall issue.

_____/s/_____
Claude M. Hilton
United States District Judge

Alexandria, Virginia
August 12, 2011